UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

United States of America,

       Plaintiff,

  vs.                         REPORT AND RECOMMENDATION

Jacob John Lussier,
a/k/a Jacob John Martin,

       Defendant.             Crim. No. 06-366 (MJD/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I. Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the Defendant's Motion to Suppress Eyewitness Identifications.

A Hearing on the Motion was conducted on December 5, 2006, at which time, the Defendant appeared personally, and by Caroline Durham, Assistant Federal Defender, and the Government appeared by Nathan P. Petterson, Assistant United States Attorney. For reasons which follow, we recommend the denial of the Defendant's Motion to Suppress.

## II. Factual and Procedural Background

In a three-Count Indictment, the Defendant is charged with one Count of murder in the first degree, in violation of Title 18 U.S.C. §§1111, 1151, and 1153(a); one Count of using, carrying, and discharging, a firearm during and in relation to a crime of violence, in violation of Title 18 U.S.C. §924(c)(1)(A)(iii); and one Count of an assault with a dangerous weapon, in violation of Title 18 U.S.C. §§113(a), 1151, and 1153(a). As pertinent to these charges, and to the Defendant's Motion to Suppress, the operative facts may be briefly summarized.[1]

At the Suppression Hearing, Timothy D. Ball ("Ball"), who is a Special Agent with the Federal Bureau of Investigation ("F.B.I."), testified at the instance of the Government. Ball is assigned to the F.B.I.'s branch office in Bemidji, Minnesota, and he was among several F.B.I., and other law enforcement officers, who were

---

[1] Rule 12(d), Federal Rules of Criminal Procedure, provides that "[w]hen factual issues are involved in deciding a motion, the court must state its essential findings on the record." As augmented by our recitation of factual findings in our "Discussion," the essential factual findings, that are required by the Recommendations we make, are contained in this segment of our Opinion. Of course, these factual findings are preliminary in nature, are confined solely to the Motions before the Court, and are subject to such future modification as the subsequent development of the facts and law may require. See, United States v. Moore, 936 F.2d 287, 288-89 (6th Cir. 1991); United States v. Prieto-Villa, 910 F.2d 601, 610 (9th Cir. 1990).

investigating the homicide of Harley Sayers ("Sayers"). Nadine Cloud ("Cloud") was interviewed by another F.B.I. Agent -- Asher L. Silkey ("Silkey") -- and she informed Silkey that she had observed the killing of Sayers, and could identify the killer. Cloud was not asked to provide a description of the killer, nor is there any evidence in the Record as to her vantage point in viewing Sayers' killer, or the time she had expended in observing the killer. Ball did not speak to Silkey, nor did he review any report by Silkey, concerning Silkey's interview of Cloud.

Ball testified that he assembled a photographic array of six (6) persons, from driver's licence records at the Beltrami County Law Enforcement Center. He sought photographs which depicted persons who had the same general height, weight, hair color, and physical characteristics of the Defendant, and who were within an age grouping from 20 to 25. Ball obtained those descriptors from the Defendant's driver's license.

Subsequently, Ball met with Cloud and advised that he would be showing her a set of six (6) photographs which might, or might not, include the suspect in Sayers' killing. See, <u>Government Exh. 1</u>.[2] Ball told Cloud that she should review the

---

[2]Government Exh. 1 is a black and white copy of the photographic array that was used, by Cloud, in the identification of the Defendant. At the time of the Hearing, (continued...)

photographs carefully, and she should not identify anyone unless she was certain. Cloud identified photograph number three (3) on the photo display, and said "that is Jake." Photograph number three (3) depicts the Defendant. At Ball's direction, Cloud wrote her name, the date of the identification, and the inscription -- "#3 is the shooter" -- next to the Defendant's photograph. See, Government Exh. 1.

As related by Ball, Cloud had been outside the residence of Renee Jourdain "Jourdain"), which is located on the Red Lake Indian Reservation, when she witnessed the shooting of Sayers. Ball knew that Cloud had reported that she had seen the Defendant earlier in the day, before the shooting.

On cross-examination, Ball testified that he was not aware that Cloud had not provided Silkey with a physical description of the suspect, although he was aware that Cloud had informed Silkey that a party was going on at the time of the shooting, with heavy drinking, and later, during the investigation of the scene, the discovery of a

---

²(...continued)
the Government offered the colored version of the display, which bore Cloud's handwriting. At the Government's request, and without objection from the Defendant, the Government was allowed to substitute the black and white copy for the original. By our observation, the complexion, and hair length of each photographic depiction, was not appreciably distinct, and although some of the persons depicted appear to have more of a visible mustache than the Defendant, none of the facial features is unduly obtrusive.

crack pipe. Ball had not heard about marijuana being smoked at the scene. Ball also was unaware that Silkey interviewed Cloud a second time, nor was he aware that Cloud had told Silkey that, at the time of the shooting, she was drunk. In addition, Ball was unable to say precisely where Cloud was standing outside of the Jourdain residence. Ball did confirm that a Dakota Bluebird was at the party, but he testified that Cloud could not identify him.

On redirect, reference was made to Silkey's report of a second interview of Cloud, which occurred after the photographic identification. In that report, Silkey related that Cloud was "not wasted;" she was drunk, but she was only starting to get drunk. On recross, Ball allowed that there was drinking on the Reservation, but he was unable to define what "wasted" meant with respect to Cloud, as he did not know her condition on the night of the shooting. Ball reconfirmed that Silkey reported that Cloud described herself as being drunk.

III.  Discussion

A.  Standard of Review.  Generally speaking, in cases in which the identity of the accused is at issue, the accused may move, under the Due Process Clause,[3] to suppress an out-of-Court identification that was secured by law enforcement officials through improper means.  See, Neil v. Biggers, 409 U.S. 188, 199 (1972).  Moreover, the Due Process challenge will extend to an anticipated in-Court identification if it was tainted by the erroneous out-of-Court procedures.  See, Foster v. California, 394 U.S. 440, 443-44 (1969); United States v. Tucker, 169 F.3d 1115, 1117-18 (8th Cir. 1999); Williams v. Lockhart, 736 F.2d 1264, 1266 (8th Cir. 1984).

Where, as here, an out-of-Court identification, through the use of an accused's photograph, is at issue, our Court of Appeals uses a two-step admissibility analysis that was first adopted by the Supreme Court in Manson v. Brathwaite, 432 U.S. 98,

---

[3]We recognize that, once a defendant's Sixth Amendment right to counsel has attached, grounds may then exist for a successful challenge to the admissibility of a lineup identification that was conducted in the absence of counsel.  See, United States v. Wade, 388 U.S. 218 (1967).  However, the Supreme Court long ago declared that, whether pre- or post-Indictment, photographic displays, when conducted without the presence of the defendant, do not implicate a defendant's Sixth Amendment rights. See, United States v. Ash, 413 U.S. 300, 317-21 (1973).  Therefore, finding no basis for the suppression of any of the photographic identifications of the Defendant under the Sixth Amendment, we limit our analysis to the protections provided by the Due Process Clause.

116 (1977).  See, United States v. Gipson, 383 F.3d 689, 698 (8th Cir. 2004); United States v. Johnson, 56 F.3d 947, 953 (8th Cir. 1995).  First, the Court must determine whether the challenged photographic identification procedure was "impermissibly suggestive." United States v. Gipson, supra at 698; see also, United States v. Johnson, supra at 953; Manson v. Brathwaite, supra at 116.  Then, should it be determined that the procedures were impermissibly suggestive, the Court must determine if the identification was, nonetheless, reliable.  See, Clark v. Caspari, 274 F.3d 507, 511 (8th Cir. 2001); Thomas v. Bowersox, 208 F.3d 699, 702 (8th Cir. 2000); United States v. Davis, 103 F.3d 660, 669 (8th Cir. 1996), cert. denied, 520 U.S. 1258 (1997)("Reliability is the linchpin in determining the admissibility of identification testimony * * *.")[internal quotation omitted]; see also, Williams v. Lockhart, supra at 1266 (concluding that not all suggestive identification procedures violate due process).

Consequently, the identification evidence will be admissible at Trial unless the totality of circumstances demonstrates that the impermissibly suggestive procedures "created a very substantial likelihood of irreparable misidentification." United States v. Gipson, supra at 698, citing United States v. Johnson, supra at 953; see also, Palmer v. Clarke, 408 F.3d 423, 435 (8th Cir. 2005); Clark v. Caspari, supra at 513 (Hansen,

C.J., concurring), quoting <u>Manson v. Brathwaite</u>, supra at 116-17.  To determine reliability, five factors are to be considered:  the opportunity of the witnesses to view the defendant at the relevant time; the witnesses' degree of attention when viewing the defendant; the accuracy of the original descriptions given by the witnesses; the level of certainty in their identifications; and the passage of time between their observations of the defendant and the photographic identifications.  See, <u>United States v. Gipson</u>, supra at 698; <u>United States v. Martin</u>, 391 F.3d 949, 953 (8th Cir. 2005); <u>United States v. Williams</u>, 340 F.3d 563, 567 (8th Cir. 2003).

  B. <u>Legal Analysis</u>.  In arguing for the suppression of Cloud's identification of him as the "shooter," the Defendant underscores the lapses in this Record as to Cloud's ability to observe the shooter, at the time of the shooting, and as to any description, by her, of the shooter's physical characteristics, as she had then observed them.  Of course, we need not address such admitted lapses in the evidence, which relate to the reliability of Cloud's testimony, unless we conclude that the procedures attendant to the photographic identification were impermissibly suggestive.  See, <u>United States v. Triplett</u>, 104 F.3d 1074, 1079 (8th Cir. 1997)("Because [defendant] has failed to make a threshold demonstration that the line-up procedure was impermissibly suggestive, we need go no further in our inquiry."), cert. denied <u>sub</u>

nom. <u>Triplett v. United States</u>, 520 U.S. 1236 (1997), citing; <u>United States v. Ramsey</u>, 999 F.2d 348, 349 (8th Cir. 1993).

Here, we find nothing impermissibly suggestive in the procedures that Ball employed in obtaining Cloud's identification of the Defendant as the shooter. As we previously noted, there is some variance in the appearance of facial hair, in the form of mustaches, on the six persons depicted in the photographic spread. These differences, however, appear to be a reflection of when the individuals last shaved, as the mustaches do not have the appearance of groomed facial hair. Cf., <u>United States v. Downs</u>, 230 F.3d 272, 274 (7th Cir. 2000)(line-up was unduly suggestive where defendant had no facial hair, and the other four (4) persons in the line-up "sported heavy moustaches"). In any event, the generalized appearance of the individuals, in all of the photographs, is remarkably similar. All have short cropped, dark hair; all have a common facial shape; and none stands out as noticeably different from the others. Nor is there any notable difference that distinguishes the Defendant's photograph from the others. To be sure, the Defendant's depiction shows a little more of his neck and shoulders, than do the rest, but that feature seems inconsequential in view of the likenesses of those persons depicted.

Moreover, Ball informed Cloud that the suspect's picture may or may not be among those shown in the photo array, and she was instructed to be certain of her identification before selecting any photograph. Cloud immediately identified photograph number 3 as "the shooter," and she further identified him as "Jake." She knew "Jake" by having seen him earlier in the day, before the shooting, as well as having seen him allegedly engaged in the shooting. The Record is clear that Ball did nothing, either directly or indirectly, to draw Cloud's attention to the photograph of the Defendant. Accordingly, we find nothing impermissibly suggestive in the procedures Ball employed in the photographic identification of the Defendant, and the Defendant's Motion to Suppress should be denied.

Even if we were to proceed to the second step of the analysis, we would recommend a denial of the Motion to Suppress, though the issue is certainly a closer question. The Government notes that Cloud saw the Defendant, on the date of the shooting, on two occasions -- once earlier in the day, and once when the shooting occurred. Further, the Government concedes that the Record does not clarify Cloud's degree of attention at the time of the shooting, and there is evidence that Cloud described herself, during her interview with Silkey, as "just starting to get drunk," when the shooting occurred. The Record does not speak to Cloud's state of sobriety

when she saw the Defendant earlier in the day. Despite these strictures in the Record presented, the Government underscores that Cloud was certain of her identification of the Defendant, and that the length of time, between Cloud's observation of the Defendant at Jourdain's residence, and her identification of him was no more than two (2) days.

Were we to reach the question of reliability, we would find the evidence sufficient to allow the Jury to consider Cloud's identification of the Defendant. Viewing the evidence in totality, Cloud saw the Defendant on two (2) occasions in close proximity to her identification of him. On one occasion her perceptions may have been impaired to some extent, although the Record does not afford precision as to the extent of that impairment, appreciable or not. In addition, there is no evidence to suggest that her observation of the Defendant earlier on the day of shooting was impaired at all. There were no identifiers on the photographic spread itself, as the photographs depicted young men with the same generalized facial features, and yet, Cloud was readily able to identify the Defendant, and to provide Ball with the shooter's identity as "Jake," corroborating her familiarity with the Defendant, whose name is "Jacob." As a result, if we were to reach the issue, then, under a totality of the circumstances analysis, we would find Cloud's identification of the Defendant to

be sufficiently reliable for presentation to a Jury. Of course, in the final analysis, it is for the Jury to determine the credibility of, and the weight to be given to, Cloud's identification under the circumstances here, see, e.g., <u>United States v. Vallie</u>, 284 F.3d 917, 920-21 (8th Cir. 2002); <u>United States v. Juvenile Male R.E.J</u>, 29 F.3d 375, 375 (8th Cir. 1994), and we make no projection how the Jury will consider Cloud's testimony on this point.

In sum, we recommend that the Defendant's Motion to Suppress Eyewitness Identifications be denied.

NOW, THEREFORE, It is --

RECOMMENDED:

That the Defendant's Motion to Suppress Eyewitness Identifications [Docket No. 23] be denied.

Dated:  December 11, 2006              <i>s/Raymond L. Erickson</i>
                                       Raymond L. Erickson
                                       CHIEF U.S. MAGISTRATE JUDGE

**NOTICE**

Pursuant to Rule 45(a), Federal Rules of Criminal Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than December 29, 2006**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than December 29, 2006**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.